SEALED 02-81143

**FILED UNDER SEAL**
**PURSUANT TO**
**31 U.S.C. § 3730(b)(2)**

CIV-MIDDLE~~BROOKS~~

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MAGISTRATE JUDGE
JOHNSON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* | ) | |
| UNDER SEAL | ) | CASE NO. |
| | ) | |
| Plaintiffs | ) | |
| | ) | FILED IN CAMERA AND |
| v. | ) | UNDER SEAL |
| | ) | |
| UNDER SEAL AND UNDER SEAL | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants | ) | |

**FILED UNDER SEAL**
**PURSUANT TO**
**31 U.S.C. § 3730(b)(2)**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*<br>DAVID CLAYMAN<br><br>    PLAINTIFFS<br><br>      *v.*<br><br>FRED L. STEINBERG, MRI RADIOLOGY NETWORK,<br>P.A., UNIVERSITY MRI OF BOCA RATON, INC.,<br>WEST BOCA OPEN MRI, INC., BOCA PHYSICIANS,<br>P.A., BOCA RATON NEUROLOGIC ASSOCIATES, P.A<br>BOCA RATON ORTHOPAEDIC GROUP, COLTON,<br>KAMINETSKY, MORRIS AND COHEN, P.A.,<br>COMPREHENSIVE NEUROLOGIC SPECIALISTS,<br>GLADES MEDICAL GROUP, ROBERT MELLMAN,<br>M.D., P.A., NEUROSCIENCE CENTER BOCA RATON,<br>RHEUMATOLOGY ASSOCIATES OF SOUTH<br>FLORIDA, CARL SALVATI, M.D. P.A., SOUTH<br>FLORIDA NEUROLOGY ASSOCIATES, P.A.,<br>EDWARD KAPLAN, BRUCE KASTIN, DAVID B.<br>HEVERT, ROBERT MELLMAN, CHERYL<br>MOSS-MELLMAN, RICHARD BAILYN, HAROLD<br>FRIEND, RONALD WILK, DAVID BUCHALTER,<br>STEVEN MEADOWS, DAVID SACHS, AND<br>MICHAEL ROSENBERG<br><br>    DEFENDANTS | CIVIL ACTION NO.<br><br><br><br>FILED UNDER SEAL<br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff/relator David Clayman files this Complaint against defendants and alleges as

follows:

## INTRODUCTION

1.     This is an action to recover damages and civil penalties on behalf of the United States of America arising from false statements and claims made or caused to be made by the defendants to the United States and its agents and intermediaries in violation of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA"). The false claims and statements at issue were made or caused to be made by the defendants in connection with kickbacks and claims for payments made for radiology services.

2.     Originally enacted in 1863, the FCA was substantially amended in 1986 by the False Claims Amendments Act. The 1986 amendments enhanced the government's ability to recover losses sustained as a result of fraud against the United States.

3.     The FCA provides that any person who knowingly submits or causes to be submitted to the government or recipients of federal funds a false or fraudulent claim for payment or approval is liable for a civil penalty of between $5,000 and $11,000 for each such claim, and three times the amount of the damages sustained by the government. The Act empowers persons having information regarding a false or fraudulent claim against the government to bring an action on behalf of the government and to share in any recovery. The complaint must be filed under seal, without service on the defendants. The complaint remains under seal while the government conducts an investigation of the allegations in the complaint and determines whether to join the action.

4.     Pursuant to the Act, plaintiff seeks to recover on behalf of the United States damages and civil penalties arising from false and improper charges contained in claims for payment that defendants submitted or caused to be submitted to the Medicare program.

2

5.      Plaintiff Clayman also alleges herein that he was terminated from his employment after discussing his concerns about coding and billing to Medicare with his employer, Fred L. Steinberg. Plaintiff Clayman asserts this constitutes reprisal and retaliation for reporting the violations under the False Claims Act.

6.      Defendants have systematically defrauded Medicare by claiming reimbursement for many thousands of radiology procedures that were not performed as ordered, were not medically necessary as performed, provided little, if any, diagnostic information or for which the billing codes were manipulated. Additionally, defendants entered into improper financial relationships and submitted false claims to the Medicare program by billing for radiology services that were tainted by those relationships. As a result, the federal government paid substantial amounts that otherwise it would not have paid.

7.      The defendants' unlawful schemes had the following elements:

a.      Defendants Fred L. Steinberg, MRI Radiology Network, P.A., University MRI of Boca Raton, Inc., and West Boca Open MRI, Inc. paid the other defendants kickbacks to induce and maintain referral relationships.

b.      Defendants routinely falsely billed Medicare for radiology procedures at a more complex level than was actually performed or required.

c.      Defendants routinely billed Medicare for radiology procedures that were not medically justified.

8.      Defendants' actions were designed solely to maximize profits illegally at the government's expense and not for a medically justifiable purpose.

3

## JURISDICTION AND VENUE

9.     The Court has jurisdiction over the subject matter of this action pursuant to both

28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on

this Court for actions brought pursuant to 31 U.S.C. § 3730.

10.     The Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. §

3732(a) which authorizes nationwide service of process and because the defendants can be found

in and transact the business that is the subject matter of this lawsuit in the Southern District of

Florida.

11.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because

defendants can be found and transact the business that is the subject matter of this lawsuit in the

Southern District of Florida.

## PARTIES

12.     *Qui tam* plaintiff David Clayman, M.D. ("Clayman") brings this action on behalf

of himself and the Government pursuant to 31 U.S.C. § 3730(b)(1).

13.     Dr. Clayman, a neuroradiologist, presently resides in Boca Raton, Florida.  He

was employed by defendant, Fred L. Steinberg from October 13, 1999 until July 11, 2002 when

he confronted Steinberg about his coding practices.  He was terminated the same day.

14.     Defendant Fred L. Steinberg, M.D. ("Steinberg"), a radiologist, is the sole owner

of all stock in the defendants MRI Radiology Network, P.A., University MRI of Boca Raton,

Inc., and West Boca Open MRI, Inc..  His Medicare provider number is 18660.  He also owns

FAU MRI Radiology Associated, LLC, Expert Radiology Network, P.A., ("ERN") and Expert

Radiology Research and Educational Foundation, Inc. ("Radiology Foundation").  The Radiology

4

Foundation is located at 22059 State Road #7, Boca Raton, FL 33428.

15.     Defendant MRI Radiology Network, P.A. ("MRN") is located at 3848 FAU Blvd., Suite 200, Boca Raton, FL 3343.  It holds Medicare provider number E1765 and does business as University MRI & Diagnostic Imaging Centers ("UMRI") and University MRI - West a.k.a. West Boca Open MRI, Inc. ("West Boca").  UMRI has the same address as the parent while West Boca is located at 22059 State Road #7, Boca Raton, FL 33428.

16.     Defendant Boca Physicians, P.A. is a medical group located at 905 Clint Moore Road, Suite 21, Boca Raton, FL 33496.  The physicians in the group include James Chong, Mark Friedman, Seba Krumholtz, Glen Rubin, and Robert Sonneborn.

17.     Defendant Boca Raton Neurologic Associates, P.A. is a Florida professional corporation and medical group located at 901 Meadows Road, Suite A, Boca Raton, FL 33486.  The practice was started in 2000 by defendant Bruce Kastin after he left Comprehensive Neurologic Specialists.

18.     Defendant Boca Raton Orthopaedic Group is a medical group located at 903 Meadows Road, Boca Raton, FL 33486.  The physicians in the group include Peter M. Schosheim, Mark S. Bromson, George J. Kolettis, Michael J. Krebsbach, Joseph R Purita, Charles E. Stewart, and Burton S. Wollowick,.

19.     Defendant Colton, Kaminetsky, Morris and Cohen, P.A. ("Colton Group") is a Florida professional corporation and medical group located at 1401 NW 9th Avenue, Boca Raton, FL 33486.  The physicians in the group include Robert M. Colton, Bernard Kaminetsky, Michelle Schwartz, Ron Morris, and Rodney Cohen.

20.     Defendant Comprehensive Neurologic Specialists is a medical group located at

2900 North Military Trail, Suite 175, Boca Raton, FL 33431. Until 2000, the physicians in the group included defendants Edward H. Kaplan and Bruce R. Kastin. Prior to starting Comprehensive Neurologic Specialists, Edward H. Kaplan was affiliated with South Florida Health Care Associates, P.A located at the same address as Comprehensive Neurologic Specialists.

21.    Defendant Glades Medical Group is located at 900 Glades Road, Boca Raton, FL 33431. The physicians in the group include defendant David B. Hevert, Jonathan Berger, Gregory Deitsch, Leah Baker, and George Neuner. It is believed that George Neuner has left the group.

22.    Defendant Robert Mellman, M.D., P.A. is a Florida professional corporation and medical group located at 1000 N.W. 9th Court, Suite 204, Boca Raton, FL 33486. The physicians in the group include defendant Robert Mellman, defendant Cheryl Moss-Mellman, and Joshua Rubin.

23.    Defendant Neuroscience Center Boca Raton is a medical group located at 1500 N.W. 10th Avenue, Suite 105, Boca Raton, FL 33486. The physicians in the group include defendants Richard Bailyn, Harold Friend, and Ronald Wilk. It is believed that Wilk has left the group.

24.    Defendant Rheumatology Associates of South Florida is a medical practice located at 1050 N.W. 15th Street, Boca Raton, FL. The physicians in the group include David Alboukrek, Shawn Baca, Richard A Cappiello, Joseph Forstot, and Ira Pardo.

25.    Defendant Carl Salvati, M.D., P.A. is a Florida professional corporation and medical practice located at 333 Camino Gardens Boulevard, Suite 100, Boca Raton, FL 33432.

6

26.     Defendant South Florida Neurology Associates, P.A. is a Florida professional corporation and medical practice located at 5162 Linton Boulevard, Delray Beach, FL 33484. The physicians in the group include Roy Katzin, Robert Schiftan, Marc Feinberg, Frederick Boltz, Stuart Kieran, and Marc Linden.

27.     Defendant David Buchalter is a physician with an office at 4800 Linton Boulevard, Suite 201, Delray Beach, FL 33455.

28.     Defendant Steven Meadows is a physician with an office at 4800 Linton Boulevard, Suite 201, Delray Beach, FL 33455.

29.     Defendant David Sachs is a physician with an office at 1905 Clint Moore Road, Suite 308, Boca Raton, FL 33496.

30.     Defendant Michael Rosenberg is a chiropractor with an office at 7015 Beracca Way, Boca Raton, FL.

## BACKGROUND

31.     Radiology is a specialty branch of medicine in which disease or illness is diagnosed using various modalities, including, among others, radiant energy, ultrasound, magnetic resonance imaging ("MRI"), and computerized axial tomography ("CT"). Diagnostic radiologists have expertise in the selection and utilization of radiological procedures and techniques and act as consultants to other physicians.

**A.**     **Medicare Program**

32.     Medicare is a federally-funded health insurance program primarily benefitting the elderly. Medicare was created in 1965 when Title XVIII of the Social Security Act was adopted and has two parts. Medicare Part A, the Basic Plan of Hospital Insurance, covers the cost of

inpatient hospital services and post-hospital nursing facility care.  Medicare Part B ("Part B"), the Voluntary Supplemental Insurance Plan, covers the cost of physicians' services and outpatient diagnostic tests such as diagnostic imaging tests.

33.     Medicare pays only for those services that are reasonable and necessary for the diagnosis or treatment of illness or injury. 42 U.S.C. § 1395y(a)1)(A).  Physicians who wish to participate in the these programs must ensure that their services are provided "economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a).

34.     The physician submits a bill using Form CMS-1500.  On the claim form, the physician certifies that the services were "medically indicated and necessary to the health of the patient . . . ."

**B.     Medicare Pays for Radiology Services Based on CPT Codes**

35.     Form CMS-1500 uses Current Procedural Terminology (CPT) codes, descriptive terms and identifying codes for reporting medical services and procedures performed by physicians.  The CPT codes provide a uniform language that accurately describes the medical and diagnostic services being provided to patients.  Each procedure or service is identified with a five digit code and Medicare reimburses based on the CPT code submitted by the physician.

36.     Medicare reimbursement for radiology services also distinguishes between the professional component ("PC") and the technical component ("TC").  The professional component consists of the radiologist's professional services for interpretation of the test and other identifiable medical services by the physician that contribute to diagnosis.  A physician providing diagnostic radiology services, ultrasound or nuclear medicine services would use either modifier '-26' or code 09926 to report the professional component.  Modifiers may be used to

indicate to the recipient of a report that a service or procedure has both a professional and technical component.

37.    The diagnostic imaging center is paid for the technical component of the service. The technical component, the taking of the test, includes expenses such as cost of equipment, technologist's salaries, etc.

38.    Radiology services that are provided in a freestanding facility can be billed either as a global fee (consisting of the combined professional and technical fees) or separately as professional and technical components.

39.    Medicare maintains fee schedules for both the PC and TC for outpatient radiology services and will pay the amount billed for the service up to the maximum established by the fee schedule.

40.    All diagnostic imaging tests must be ordered by the physician who is treating the patient. Diagnostic tests not ordered by the treating physician are not considered reasonable and necessary and, therefore, are not reimbursable. *Id.* § 410.32(a). Therefore, if the referring physician did not order a more extensive (or higher coded) procedure than, by definition, it is not reimbursable. Only the mammography exception authorizes a diagnostic radiologist to order a diagnostic mammogram "based on the findings of a screening mammogram even though the physician does not treat the beneficiary." *Id.* § 410.32(a)(2).

## C.    Medicare Anti-Kickback Provision

41.    The Medicare and Medicaid Fraud and Abuse Statute ("Anti-Kickback Statute or Statute") was first enacted under the Social Security Act in 1977. The Anti-Kickback Statute penalizes anyone who knowingly and willfully solicits, receives, offers or pays remuneration to

9

induce or in return for referring the purchasing, recommending or ordering of services that are reimbursable under Medicare. 42 U.S.C. § 1320a-7b(b). Remuneration includes the transfer of anything of value, in cash or in-kind, directly or indirectly, covertly or overtly. The Statute ascribes liability to both sides of an impermissible kickback relationship.

42.     The Anti-Kickback Statute contains statutory exceptions that exempt certain transactions from its prohibitions. These exceptions include regulatory safe harbors for space rental, equipment rental, and personal services and management contracts as long as certain standards are met. The space and equipment rental safe harbors apply to payments to a lessor for the use of the premises or equipment as long as "the lease is intended to provide the lessee with access for periodic intervals of time" with schedules, intervals, and costs expressly stated in the lease, the rental charge "is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties . . . ." 42 C.F.R. § 1001.952(b), (c). Thus, where payments purportedly made to lease real property or equipment do not comply with the conditions and are made with the intent to reward referrals, the Anti-Kickback Statute has been violated.

43.     The personal services or management contracts safe harbor applies to payments to an agent as long as "the agency agreement is intended to provide the services of the agent on a periodic, sporadic or part-time basis" with schedules, intervals, and costs expressly stated in the contract, the compensation "is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties . . . ." *Id.* at § 1001.952(d). Thus, where

compensation purportedly is paid for personal services or management that are not provided and is made with the intent to reward referrals, the Anti-Kickback Statute has been violated.

## GENERAL FRAUD ALLEGATIONS

44.     As alleged below, the fraud entails three issues that caused the overpayment of Medicare funds by the federal government in substantial amount: (1) upcoding radiology services; (2) billing for medically unnecessary radiology services; and (3) billing for radiology services referred or ordered by other defendants with whom there were financial relationships that violated the Anti-Kickback Statute.

**D.     Defendant Steinberg Systematically Upcoded**

45.     Steinberg created a billing system at his imaging centers that systematically upcoded radiology services.  Upcoding is the practice of using a CPT code that provides a higher payment rate than the code that actually describes the service furnished to the patient.

46.     The following examination process was followed at all of Steinberg's imaging centers.

a.     The patient presents to the reception room where a "jacket" is created.

b.     A copy of the referring physician's prescription along with a superbill is placed in the jacket.  A superbill is a billing and coding form that contains all the relevant radiology procedures with a column where the radiology technologist checks off the services performed. The patient along with the jacket is transferred to the radiology technologist who will perform the requisite procedures.

c.     Based on established protocol written by Steinberg, the technician performs the procedure(s) and checks off the superbill.

d.      The completed films are placed in the jacket, along with the prescription and

superbill, and given to the reading radiologist.  The radiologist reads the films, dictates a report,

and returns the jacket to the holding area.  The report is titled based on the procedure checked off

on the superbill while the report findings are dictated based on the actual procedure performed.

For example, a report may be titled "CT chest with and without contrast" while the rest of the

report will describe a CT of the chest with contrast only.

e.      The superbills are reviewed by Steinberg and sent to the billing office while the

jacket is filed in the file room.

f.      Some of the reports dictated by the radiologists were transcribed to letterhead

belonging to one of Steinberg's imaging centers.  Other reports were transcribed to letterhead

belonging to one of the other defendants.  For instance, Steinberg had letterhead for, *inter alia*,

Comprehensive Neurologic Specialists, Neuroscience Center of Boca Raton, Inc., and South

Florida Health Care Associates, P.A.  Additionally, Steinberg paid Linda Brandon for

transcription services for some of the referring physicians including, *inter alia*, Alan Melotek,

Boca Physicians, Boca Raton Medical Group, Boca Raton Neurologic Associates, Boca Raton

Orthopaedic Group, and Comprehensive Neuroscience Center.

47.     Defendants billed for the radiology procedures provided by Steinberg based on the

title of the report provided to them by Steinberg.  As Steinberg prescribes the scan protocols for

the other defendants, the same coding and billing schemes used by Steinberg will be found in the

charges submitted to Medicare by the other defendants.

48.     On information and belief, relator alleges that Steinberg performed virtual

colonoscopies that are not reimbursable by Medicare but billed them to Medicare using

reimbursable codes.

49.     On information and belief, relator alleges that defendants routinely upcoded and billed for medically unnecessary exams in all areas of diagnostic radiology.

**E.     Defendants Upcoded CT Scans**

50.     Computerized tomography of the chest is billed under three possible CPT codes - 71250, 71260, and 71270.  The first code, 71250, refers to a CT of the chest without contrast material.  Contrast material is an internally administered substance that has a different opacity from soft tissue on computerized tomography and is used to differentiate or enhance visualization of areas or lesions in the organ to be studied.  CPT code 71260 refers to a chest CT with contrast material(s).  Code 712470 denotes a chest CT without contrast material, followed by contrast material(s), and then a CT of further sections.

51.     Medicare pays $75 more for code 72170 than it does for code 72160.

52.     Defendants are systematically performing CT scans of the chest with contrast and reporting them as CT scans of the chest with and without contrast.  Defendants bill using CPT code 71270 instead of the legitimate, but less profitable, code 71260.

53.     For example, on September 4, 2001 a CT scan of the chest was performed on a Medicare patient referred to Steinberg by Dr. Robert Sonneborn.  The report title was "CT scan of the chest with and without contrast."  The technique section of the report revealed that only a CT scan of the chest with contrast was performed.

54.     Similarly, on July 20, 2001 a CT scan of the chest was performed on a Medicare patient referred to Steinberg by Dr. Robert Colton.  The report title was "CT scan of the chest with and without contrast."  The tchnique section of the report revealed that only a CT scan of

13

the chest with contrast was performed.

55.　　Defendants are systematically performing CT scans of the abdomen and pelvis with contrast and reporting them as CT scans of the abdomen and pelvis with and without contrast. Defendants bill using CPT codes 74170 and 72194 instead of the legitimate, but less profitable, codes 74160 and 72193. The total overpayment for the two codes is $133.

56.　　For example, on December 18, 2000 a CT scan of the abdomen and pelvis was performed on a Medicare patient referred to Steinberg by Dr. James Chong. The report title was "CT scan of the abdomen and pelvis with and without contrast." The technique section of the report revealed that only a CT scan of the abdomen and pelvis with contrast was performed.

57.　　Similarly, on July 2, 2001 a CT scan of the abdomen and pelvis was performed on a Medicare patient referred to Steinberg by Dr. Joshua Rubin. The report title was "CT scan of the abdomen and pelvis with and without contrast." The technique section of the report revealed that only a CT scan of the abdomen and pelvis with contrast was performed.

58.　　Defendants are systematically performing CT scans of the neck with contrast and reporting them as CT scans of the neck with and without contrast. Defendants bill using CPT code 70492 instead of the legitimate, but less profitable, code 70491. The difference in payment is $57.

59.　　For example, on October 30, 2001 a CT scan of the neck was performed on a Medicare patient referred to Steinberg by Dr. Ronnie Morris. The report title was "CT scan of the soft tissue neck with and without contrast." The technique section of the report revealed that only a CT scan of the neck with contrast was performed.

60.　　Similarly, on November 10, 2000 a CT scan of the neck was performed on a

14

Medicare patient referred to Steinberg by Dr. Hevert. The report title was "CT scan of the soft tissues of the neck with and without contrast." The technique section of the report revealed that only a CT scan of the neck with contrast was performed.

**F.      Defendants Routinely Add a Pelvis CT to Abdominal CTs**

61.      Radiologists may receive an order from a referring physician that requests, for example, a "CT of the abdomen, patient lower abdominal pain." To the radiologist, that translates into the need for both a CT of the abdomen and a CT of the pelvis because the referral and clinical presentation suggest pathology which may involve the abdomen and/or pelvis. In such a circumstance, the proper coding would be CPT code 74160 (computerized axial tomography, abdomen; with contrast material) and CPT code 72193 (computerized axial tomography, pelvis; with contrast material).

62.      The radiologist may, however, receive an order requesting a "CT of the abdomen, attention liver" (or pancreas, or some other upper abdominal organ). In such an instance, the proper coding would be CPT code 74160. A CT of the pelvis would be medically unnecessary as it would provide no diagnostic information relevant to the area of concern, i.e. the liver or pancreas. In the event that the radiologist believes that further study is indicated, a written order must be requested from the referring physician or he cannot bill for the additional procedure(s).

63.      Defendants routinely bill for CT scans of both the abdomen and pelvis, regardless of medical necessity. The reimbursement for CPT code 72194 (CT pelvis with and without contrast) is $385.

**G.      Defendants Routinely Unbundle MRI Scans of the Brain**

64.      Radiologists may receive an order from a referring physician that requests an MRI

15

of the pituitary. There is no separate and distinct CPT code for an MRI of the pituitary as it is part of an MRI of the brain. Defendants perform an MRI of the brain and a separate scan through the pituitary fossa and code the latter scan as CPT code 70543 (MRI orbit, face, and neck). The reimbursement for code 70543 is $1,029.

65.     For example, on March 30, 2001 an MRI of the brain and an MRI of the pituitary purportedly were performed on a Medicare patient referred to Steinberg by Dr. Glen Rubin. Two reports were dictated. The former was titled "MRI of the brain with and without contrast." The latter was entitled "MRI of the pituitary with and without contrast."

66.     Similarly, defendants unbundle the MRI of the brain by reporting separately an "MRI of the internal auditory canals with and without contrast." The CPT manual does not provide a separate and distinct code for an MRI of the internal auditory canals. Defendants bill for the scan using CPT code 70543 (MRI orbit, face, and neck). The reimbursement for code 70543 is $1,029.

67.     For example, on March 31, 2000 an MRI of the brain and an MRI of the internal auditory canals purportedly were performed on a Medicare patient referred to Steinberg by Dr. Bruce Kastin. Two reports were dictated. The former was titled "MRI of the brain with and without contrast." The latter was entitled "MRI of the internal auditory canals with and without contrast." The findings presented in the report for the internal auditory canals were all included verbatim in the report for the brain.

68.     Similarly, on April 28, 1999 an MRI of the brain and an MRI of the internal auditory canals purportedly were performed on a Medicare patient referred to Steinberg by Dr. Harold Friend. Two reports were dictated. The former was titled "MRI of the brain with and

without contrast." The latter was entitled "MRI of the internal auditory canals with and without contrast." The findings presented in the report for the internal auditory canals were all included verbatim in the report for the brain.

## H.     Defendants Add MRIs of the Hips to Pelvis MRI

69.     An MRI scan of the pelvis without contrast is coded 72195. An MRI scan of any lower extremity joint without contrast is coded 73721.

70.     On information and belief, relator alleges that defendant Steinberg bills for an MRI of the right hip, an MRI of the left hip, and an MRI of the pelvis when actually performing only an MRI of the pelvis.

## I.     Defendants Perform and Bill for Medically Unnecessary Procedures

71.     A colorflow duplex ultrasound of the carotid and vertebral arteries, coded 93880, is medically indicated for patients with suspected or known carotid arterial disease. It includes information obtained with procedures coded 93875.

72.     Procedures coded 93875are non-invasive physiologic studies and are allowed on the same date of service as code 93880 if the provider can demonstrate medical necessity, such as greater than 50 percent stenosis on the duplex scan.

73.     Defendants routinely are performing and billing for an ophthalmic artery bloodflow examination with a duplex scan. The ophthalmic artery bloodflow examination is a rarely performed procedure and has no clinical validity in the absence of severe carotid disease.

74.     Reimbursement for CPT code 93875 is $56. By adding the medically unnecessary examination, defendants are fraudulently inflating their reimbursement from Medicare.

**J.**     **Defendants Fraudulently Bill Abdominal and Retroperitoneal Ultrasound Studies**

75.     Ultrasound studies can be performed and billed as either complete or limited studies. A complete study entails a comprehensive and intensive procedure and is intended to provide information related to an entire area of the body, such as the abdomen. Reimbursement includes the patient care required to perform the study, supervision of the studies, and interpretation and analysis of the study results. A limited study focuses on a single organ or quadrant or is a follow-up to an earlier study. Medicare reimburses more for the complete study due to its greater complexity.

76.     Defendants have routinely coded and billed complete studies that were either not medically necessary or not performed as billed. These include ultrasound studies for the abdomen and retro peritoneum.

77.     Complete abdominal ultrasound studies are performed to evaluate the entire abdomen including the liver, gallbladder, spleen, pancreas, kidneys, and abdominal aorta and are coded using CPT code 76700. When a limited study is sufficient because only a single organ or quadrant needs to be examined, the proper coding is 76705. Defendants routinely bill abdominal ultrasounds as complete studies, although the dictated report would indicate only a limited study was performed.

78.     For example, on July 10, 2001 an abdominal ultrasound was done on a Medicare patient referred to Steinberg by Dr. Morris. The report discussed findings related to the gallbladder and liver and should have been billed as a limited study.

79.     Complete retroperitoneal ultrasound studies are performed to evaluate the entire retroperitoneum including kidneys, adrenal glands, and urinary bladder and are coded using CPT

18

code 76770.  When a limited study is sufficient because only the kidneys or bladder needs to be examined, the proper coding is 76775.  Defendants routinely bill retroperitoneal ultrasounds as complete studies, although the dictated report would indicate only a limited study was performed.

80.     Defendants routinely add a retroperitoneal ultrasound to abdominal ultrasound studies.  For example, on May 3, 2000 an ultrasound of the abdomen and retroperitoneum was done on a Medicare patient referred to Steinberg by Dr. Mellman.  The report indicated that the proper code for the procedure was 76700, a complete abdominal study.  Because the complete abdominal study included the retroperitoneum any additional coding for the retroperitoneum was fraudulent.

### ANTI-KICKBACK STATUTE ALLEGATIONS

81.     Types of provider incentive programs Steinberg used to compensate physicians, directly or indirectly, for referring patients included: (1) payment for personal and management services which require few, if any, substantive duties by the physician, (2) facility and equipment leases, and (3) special financial arrangements.

82.     Steinberg had an aggressive marketing program for which he spent $636,402 between 1999 and the middle of 2002.  During that same time period, his revenue from patient fees totaled $33,202,652.  The majority of the marketing costs are expensed to MRN.  Relator was informed that Steinberg's marketing program included delivering gift certificates to the office staff of the other defendants.  This inducement recently was curtailed although the staff were told they would receive other rewards in lieu of the gift certificates.

83.     Such inducements are harmful to the federal government because they encourage unnecessary treatments, influence the free exercise of medical judgment by providers, limit

patient options, and lead to higher federal payments for medical services.

**K.**     **Fraudulent Personal Service and Management Relationships**

84.     Steinberg created medical directorships requiring little, if any, actual expenditure of time by the physicians. The medical directorships are, essentially, financial inducements to the physicians for patient referrals to Steinberg's imaging centers in violation of the Medicare Anti-Kickback Statute.

85.     The fraudulent scheme entailed the physicians entering into a "Medical Director Agreement" with one of Steinberg's imaging centers or a "Clinical Investigation Agreement" with Steinberg's Radiology Foundation. The agreements specified the purported duties, amount of time each physician would devote to his or her duties, and the compensation.

a.     On February 1, 1999, Edward Kaplan ("Kaplan") entered into a renewable one year medical director agreement with UMRI whereby he would devote 12 hours per month of his time and UMRI would pay him $6,000 per month. On August 1, 1999, he also entered into a month-to-month clinical investigator agreement with Radiology Foundation whereby he would devote no more than five hours per month and be compensated at the rate of $500 per hour. Steinberg's financial records for 1999 showed Kaplan received from Radiology Foundation $36,000 for research and education fees and $6,000 for consulting fees as well as $6,000 from UMRI for undesignated fees.

b.     On February 1, 1999, Bruce Kastin ("Kastin") entered into a renewable one year agreement with UMRI whereby he would devote 12 hours per month of his time and UMRI would pay him $6,000 per month. Steinberg's financial records for 1999 showed Kastin received from Radiology Foundation $6,000 for medical directorship fees and $12,000 for research fees

as well as $6,000 from UMRI for consulting fees.

     c.     On February 1, 1999, David Hevert ("Hevert") entered into a renewable one year agreement with UMRI whereby he would devote 6 hours per month of his time and UMRI would pay him $3,000 per month.  Steinberg's financial records showed Hevert received from Radiology Foundation $7,000 in 2000, $11,000 in 2001, and $6,000 in 2002 for medical directorship fees.  In February 2000, Hevert referred 29 patients to Steinberg that generated $67,940 in revenue.

     d.     On February 1, 1999, Robert Mellman ("Mellman") entered into a renewable one year agreement  with UMRI whereby he would devote 4 hours per month of his time and UMRI would pay him $1,000 per month.  Steinberg's financial records showed Mellman received: (1) from UMRI in 1999, $6,000 for medical director fees, $2,000 for research, (2) in 2000, $2,000 for medical director fees and $9,000 for research from Radiology Foundation, $23,000 for consulting from MRN, and from UMRI $1,000 for medical director fees.

     e.     On March 1, 1999, Richard Bailyn ("Bailyn") entered into a renewable one year agreement with UMRI whereby he would devote 4 hours per month of his time and UMRI would pay him $2,000 per month.  Steinberg's financial records showed Bailyn received from Radiology Foundation $2,000 in 1999 for medical director fees and $14,000 for research director fees s well as $4,000 in 2000 for research director fees.  In February 2000, Bailyn referred 49 patients to Steinberg that generated $122,835 in revenue.

     f.     In 1999, Ronald Wilk ("Wilk") entered into a "Clinical Investigation Agreement" with Radiology Foundation whereby he would devote no more than five hours per month and be compensated at the rate of $2,000 per month.  Steinberg's financial records showed that in 1999

Wilk received from Radiology Foundation $2,000 for medical director fees and $14,000 for research fees. In February 2000, Wilk referred 25 patients to Steinberg that generated $47,148 in revenue.

      g.     Steinberg's financial records showed that in 1999 Harold Friend ("Friend") received from Radiology Foundation $2,000 for medical director fees and $10,000 for research fees, and $4,000 for undesignated fees. In February 2000, Friend referred 32 patients to Steinberg that generated $70,834 in revenue.

      h.     On June 1, 1999, David Buchalter ("Buchalter") entered into a renewable one year agreement with UMRI whereby he would devote 4 hours per month of his time and UMRI would pay him $2,000 per month. Steinberg's financial records showed Buchalter received from Radiology Foundation the following research fees: $14,000 in 1999, $24,000 in 2000, $22,000 in 2001, and $12,000 in 2002. The "Special Doctors Report" for January through April 2001 showed collections from Buchalter totaled $60,487.

      i.     On June 1, 1999, Steve Meadows ("Meadows") entered into a renewable one year agreement with UMRI whereby he would devote 4 hours per month of his time and UMRI would pay him $2,000 per month. Steinberg's financial records showed Meadows received from Radiology Foundation $2000 in 1999 for consultant fees as well as research fees totaling $14,000 in 1999, $22,000 in 2000, $22,000 in 2001, and $12,000 in 2002. The "Special Doctors Report" for January through April 2001 showed collections from Meadows totaled $13,781.

      j.     On February 1, 1999, David Sachs ("Sachs") entered into a renewable one year agreement with UMRI whereby he would devote 4 hours per month of his time and UMRI would pay him $2,000 per month.

    k.     Cheryl Moss-Mellman was paid $2,000 by UMRI for services as a medical director for February and March 2000.

**L.**    **Fraudulent Equipment and Facility Leases**

    86.     Defendants have entered into fraudulent equipment and facility leases that are, essentially, financial inducements to the physicians for patient referrals to Steinberg's imaging centers in violation of the Medicare Anti-Kickback Statute.

    87.     The fraudulent scheme entailed the physicians entering into an "Equipment Lease" or "Facility Lease Agreement" with one of Steinberg's imaging centers. The equipment leases specified the terms, equipment location, and type of equipment leased.

    88.     The facility agreements specified the term, rent, use of facility, and access times. The lessees, however, did not comply with the terms of the lease as they did not provide a physician to be present during the times scans were performed and did not have scans for their patients preformed only during the times specified in the lease.

    89.     In 2000, Boca Raton Neurologic Associates signed an equipment lease with UMRI for ultrasound equipment to be placed in its office at a lease rate of $6,000 per year. During that same time, the practice hired Steinberg to an "Employment Agreement" for $6,000 per year to perform radiology services.

    90.     On October 12, 1999, Steinberg sent Boca Raton Orthopaedic Group a technical services agreement and an employment agreement for reading services. Also on October 14, 1999, Steinberg sent the group an MRI lease agreement in which he explained the net revenues that would accrue to the group if it leased the equipment and hired Steinberg to read the scans. The group was included on the "Special Fee Schedule" report Steinberg created for physicians

with whom he had special relationships. According to the report, Boca Raton Orthopaedic Group billed the MRI scans for Medicare patients and Steinberg billed for the other types of scans on behalf of the group.

91.     On May 17, 2000, Steinberg sent Glades Medical Group a letter with a bone mineral density lease agreement. The letter also explained that the lease was set for 10 scans per month but, hopefully, they would perform 30-40 scans and generate revenue between $4,000 to $5,700 per month. Additionally, the letter explained that lease payments would be deferred until the collections come and that he "included checks for the Medical Directorships retroactive to Jan." The "Volume Report for Glades Med. Group" generated November 30, 2000 showed that the group referred business to Steinberg valued at $554,380 for MRI scans and $223,085 for CT scans. In February 2000, Hevert alone referred 29 patients that generated $67,940 in revenue. The "Special Doctors Report" for January through April 2001 showed collections from physicians in the group totaled over $113,500 with Hevert accounting for over $71,000 of the total amount.

92.     On January 15, 2001, the Colton Group entered into a "Bone Mineral Density Facility Lease Agreement" with UMRI for a base rate of $40 per hour. The practice had exclusive use of the facility during certain time and was to provide a physician to be physically present during the scans. Neither condition was ever complied with. Additionally, Colton received $5,000 in 2000 from Radiology Foundation for education and research and the same amount in 2001 from MRN for equipment fees. In 2001, Morris received $5,000 from MRN for equipment fees and in 2002 Kaminetsky received the same payment. During February 2000, the Colton Group generated $15,080 in revenue for Steinberg. The "Special Doctors Report" for

24

January through April 2001 showed collections from physicians in the Colton Group that totaled over $40,000.

93.     On May 15, 2000, Mellman signed an "Ultrasound Facility Lease Agreement" with UMRI for a base rate of $40 per hour, although the "Special Fee Schedule" showed the rate at $20 per scan. The practice had exclusive use of the facility during certain time and was to provide a physician to be physically present during the scans. Neither condition was ever complied with. Additionally, from 1999 through 2000, UMRI paid Mellman $30,5000 in equipment fees, $27,000 in leases and rents, and $3,000 for a loan. Steinberg's November 30, 2000 "Volume Report" showed that the Mellman group referred business to Steinberg valued at $254,855 for MRI scans and $283,370 for CT scans. For February 2000 Steinberg valued the referrals at $94,415.

**M.     Fraudulent Financial Arrangements**

94.     On September 13, 1999, Steinberg sent a letter to Boca Physicians, P.A. ("BP") that outlined a radiology reading services agreement between BP and MRN. BP was to perform the x-rays and ultrasounds and MRN would write the reports. The reading rates were set at below market rates of $8 per x-ray and $15 per ultrasound. The "Referring Doctor Report for February 2000" showed revenues from BP of $132,200. Additionally, BP generated revenue totaling $135,695 from January through April 2001.

95.     On July 27, 1999, Steinberg sent Carl Salvati ("Salvati") a letter that clarified the financial arrangements between them and included a "Real Estate Sub-Lease", an "Employment Agreement" for Steinberg, and a "Technical Component Services Agreement." Per the letter and agreements, UMRI leased office space from Salvati on a monthly basis for $1,000 per month to

perform ultrasounds. UMRI billed the technical component and Salvti the professional

component. In addition, UMRI performed MRI exams and billed the technical component while

Salvati employed Steinberg to read the scans at the rate of $250 per hour.

96.     On November 16, 1998, South Florida Neurology Associates ("SFNA") entered

into a "Technical Component Services Agreement" with UMRI that stipulated UMRI would

perform and bill the technical component for CT and MRI scans and SFNA would perform and

bill the professional component. The "Referring Doctors Report for February 2000" showed

revenues from SFNA of $48,400.

97.     On April 3, 2000, Steinberg sent Michael Rosenberg ("Rosenberg") a lease

agreement letter that stipulated that UMRI would provide 20 noncontrast MRI scans per month at

$400 per scan and MRI scans with contrast at $850 per scan. Steinberg wrote "this rate is below

our usual rate and I need you to keep this confidential." Steinberg estimated that Rosenberg

could collect $2,100 to $2,3000 per MRI with contrast.

98.     On April 16, 2001, Steinberg sent Rheumatology Associates of South Florida a

letter related to extremity MRI scans and proposed four scenarios for leases, billing, and

performance of the MRI scans. In all cases, Steinberg would prescribe the scan protocols. The

letter provided the group with income projections from $258,640 to $1,034,560 based on the

number of scans performed per day over a 250 day period.

99.     On information and belief, relator alleges that defendants kickback scheme has

had a profound impact on the Medicare referrals to other radiology practices in the area.

100.    From at least 1998, defendants have been overcharging the Medicare program by

submitting claims to the Medicare program for claims for radiology services that were not legally

reimbursable as claimed or not provided as claimed or were tainted by improper financial relationships.

101.   As a result of defendants' knowing and deliberate submission of false claims for reimbursement for radiology services that were not legally reimbursable as claimed or not provided as claimed, the Medicare program has suffered direct and substantial damage.

## UNLAWFUL RETALIATION ALLEGATIONS

102.   Dr. Clayman believes and alleges that he was discharged because he discussed his concerns about fraudulent billing practices with defendant Steinberg.

## COUNT ONE
### 31 U.S.C. §§ 3729(a)(1)

103.   Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 101 of this Complaint.

104.   This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

105.   Through the acts described above, defendants and their agents and employees knowingly presented and caused to be presented to the United States Government fraudulent claims, records, and statements in order to obtain reimbursement for radiology services provided under the Medicare program.

106.   The United States, unaware of the falsity of the claims made by the defendants, approved, paid, and participated in payments made by the United States' fiscal intermediaries for claims that otherwise would not have been allowed.

107.   By reason of these payments and approvals, the United States has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

## COUNT TWO
31 U.S.C. §3 729(a)(2)

108.   Relator realleges and incorporates by reference the allegations made in Paragraphs

igh 101 of this Complaint.

109.   This is a claim for treble damages and penalties under the False Claims Act, 31

§§ 3729 *et seq.*, as amended.

110.   Through the acts described above, defendant knowingly made, used, and caused to

le and used false records and statements to get false or fraudulent claims paid or approved

United States Government.

111.   The United States unaware of the falsity of the records, statements, and claims

ir submitted by defendants and their agents and employees paid defendants for claims that

not be paid if the truth were known.

112.   By reason of the defendants' false records, statements, and claims the United

ias been damaged in substantial amount.

## COUNT THREE
False Claims Act
31 U.S.C. §3730(h)

113.   Plaintiff Clayman realleges and incorporates by reference the allegations

ed in Paragraphs 1 through 102 of this Complaint.

114.   This is a claim for compensation for all financial damages plaintiff Clayman

:d as a result of his unlawful discharge by defendant in violation of the False Claims Act;

115.   Through the acts described above, officers, agents, and/or employees of defendant

·g terminated plaintiff Clayman from his employment because of lawful acts he pursued

:rance of this false claims action under the False Claims Act, including his report of the

28

false claims to his employer.

116.   Plaintiff Clayman has suffered harm, humiliation, embarrassment, and mental anguish.  Defendant's actions violated 31 U.S.C. § 3730(h) and damaged Plaintiff in an amount to be determined at trial.

**WHEREFORE**, plaintiff/relator requests that judgment be entered against defendants, ordering that: -

a.      defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*;

b.      defendants pays an amount equal to three times the amount of damages the United States have sustained because of defendants' actions, plus a civil penalty against defendants of not less than $5,500, and not more than $11,000 for each violation of 31 U.S.C. § 3729;

c.      plaintiff/relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

d.      plaintiff/relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d) and (h);

e.      plaintiff Clayman be awarded appropriate money damages for unlawful discharge including, but not limited to, compensatory damages for harm, humiliation, embarrassment, and mental anguish and punitive damages for defendant Steinberg's conduct and the conduct of officers, agents, and employees of defendant Steinberg in violation of 31 U.S.C. § 3730(h);

f.      plaintiff Clayman be awarded an amount sufficient to compensate him for all financial damages he sustained as a result of defendant Steinberg's unlawful termination of his employment in violation of 31 U.S.C. § 3730(h), including, but not limited to, compensating him

for two times the lost wages, benefits, and other remuneration, and interest thereon; and

       g.     the United States and plaintiff/relator be granted all such other relief as the Court

deems just and proper.

## REQUEST FOR TRIAL BY JURY

     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff hereby demands a

trial by jury.

Respectfully submitted,


Terry A. Smiljanich
Florida Bar No.: 145349
Christopher Casper
Florida Bar No.: 048320
JAMES, HOYER, NEWCOMER & SMILJANICH, P.A.
One Urban Centre, Suite 550
4830 W. Kennedy Blvd.
Tampa, Florida 33609
Telephone: (813) 286-4100
Fax: (813) 286-4174

Bonny Harbinger
PHILLIPS AND COHEN
2000 Massachusetts Avenue, NW
Washington, DC 20036
(202) 833-4567
(202) 833-1815 (fax)

COUNSEL FOR *QUI TAM* PLAINTIFF

reimbursable as claimed or not provided as claimed or were tainted by improper financial relationships.

101.    As a result of defendants' knowing and deliberate submission of false claims for reimbursement for radiology services that were not legally reimbursable as claimed or not provided as claimed, the Medicare program has suffered direct and substantial damage.

## UNLAWFUL RETALIATION ALLEGATIONS

102.    Dr. Clayman believes and alleges that he was discharged because he discussed his concerns about fraudulent billing practices with defendant Steinberg.

## COUNT ONE
### 31 U.S.C. §§ 3729(a)(1)

103.    Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 101 of this Complaint.

104.    This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

105.    Through the acts described above, defendants and their agents and employees knowingly presented and caused to be presented to the United States Government fraudulent claims, records, and statements in order to obtain reimbursement for radiology services provided under the Medicare program.

106.    The United States, unaware of the falsity of the claims made by the defendants, approved, paid, and participated in payments made by the United States' fiscal intermediaries for claims that otherwise would not have been allowed.

107.    By reason of these payments and approvals, the United States has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

27

JS 44
(Rev 12/96)

# CIVIL COVER SHEET

COPY FOR JUDGE

FILED

SEALED

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court This form, approved by the Judicial Conference of the United States in September 1974 is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM)

## I. (a) PLAINTIFFS
United States ex rel.
David Clayman

## DEFENDANTS
Fred L. Steinberg, MRI Radiology Network P.A., University MRI of Boca Raton, Inc., et al.

CIV-MIDDLEBROOKS

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   Palm Beach
(IN U.S PLAINTIFF CASES ONLY)
NOTE   IN LAND CONDEMNATION CASES. USE THE LOCATION OF THE TRACT OF LAND INVOLVED

MAGISTRATE JUDGE JOHNSON

(c) ATTORNEYS (FIRM NAME ADDRESS AND TELEPHONE NUMBER)
James Hoyer, 4830 W. Kennedy #550, Tampa 33609   (813) 286-4100
Phillips & Cohen, 2000 Massachusetts Ave, DC, 20036   (202) 833-4567

ATTORNEYS (IF KNOWN)

(d) CIRCLE COUNTY WHERE ACTION AROSE   DADE,   MONROE,   BROWARD,   (PALM BEACH),   MARTIN,   ST. LUCIE,   INDIAN RIVER,   OKEECHOBEE   HIGHLANDS

## II. BASIS OF JURISDICTION   (PLACE AN X IN ONE BOX ONLY)

☒ 1 U S Government Plaintiff

☐ 2 U S Government Defendant

☐ 3 Federal Question
(U S Government Not a Party)

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)   AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT   (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance ☐ 120 Marine ☐ 130 Miller Act ☐ 140 Negotiable Instrument ☐ 150 Recovery of Overpayment & Enforcement of Judgment ☐ 151 Medicare Act ☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) ☐ 153 Recovery of Overpayment of Veteran's Benefits ☐ 160 Stockholders' Suits ☐ 190 Other Contract ☐ 195 Contract Product Liability | **PERSONAL INJURY** ☐ 310 Airplane ☐ 315 Airplane Product Liability ☐ 320 Assault Libel & Slander ☐ 330 Federal Employers Liability ☐ 340 Marine ☐ 345 Marine Product Liability ☐ 350 Motor Vehicle ☐ 355 Motor Vehicle Product Liability ☐ 360 Other Personal Injury | **PERSONAL INJURY** ☐ 362 Personal Injury Med Malpractice ☐ 365 Personal Injury Product Liability ☐ 368 Asbestos Personal Injury Product Liability **PERSONAL PROPERTY** ☐ 370 Other Fraud ☐ 371 Truth in Lending ☐ 380 Other Personal Property Damage ☐ 385 Property Damage Product Liability | B☐ 610 Agriculture B☐ 620 Other Food & Drug B☐ 625 Drug Related Seizure of Property 21 USC 881 B☐ 630 Liquor Laws B☐ 640 R R & Truck B☐ 650 Airline Regs B☐ 660 Occupational Safety/Health B☐ 690 Other | ☐ 422 Appeal 28 USC 158 ☐ 423 Withdrawal 28 USC 157 **A PROPERTY RIGHTS** ☐ 820 Copyrights ☐ 830 Patent ☐ 840 Trademark | ☐ 400 State Reapportionment ☐ 410 Antitrust ☐ 430 Banks and Banking ☐ 450 Commerce/ICC Rates/etc ☐ 460 Deportation ☐ 470 Racketeer Influenced and Corrupt Organizations ☐ 810 Selective Service ☐ 850 Securities/Commodities/ Exchange ☐ 875 Customer Challenge 12 USC 3410 ☐ 891 Agricultural Acts ☐ 892 Economic Stabilization Act ☐ 893 Environmental Matters ☐ 894 Energy Allocation Act ☐ 895 Freedom of Information Act ☐ 900 Appeal of Fee Determination Under Equal Access to Justice ☐ 950 Constitutionality of State Statutes ☐ 890 Other Statutory Actions A OR B |
| **A REAL PROPERTY** ☐ 210 Land Condemnation B☐ 220 Foreclosure ☐ 230 Rent Lease & Ejectment ☐ 240 Torts to Land ☐ 245 Tort Product Liability ☐ 290 All Other Real Property | **A CIVIL RIGHTS** ☐ 441 Voting ☐ 442 Employment ☐ 443 Housing/ Accommodations ☐ 444 Welfare ☐ 440 Other Civil Rights | **PRISONER PETITIONS** B☐ 510 Motions to Vacate Sentence **HABEAS CORPUS** B☐ 530 General B☐ 535 Death Penalty B☐ 540 Mandamus & Other B☐ 550 Civil Rights B☐ 555 Prison Condition | **A LABOR** ☐ 710 Fair Labor Standards Act ☐ 720 Labor/Mgmt Relations ☐ 730 Labor/Mgmt Reporting & Disclosure Act ☐ 740 Railway Labor Act ☐ 790 Other Labor Litigation ☐ 791 Empl Ret Inc Security Act | **B SOCIAL SECURITY** ☐ 861 HIA (1395ff) ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI ☐ 865 RSI (405(g)) **FEDERAL TAX SUITS** A☐ 870 Taxes (U S Plaintiff or Defendant) A☐ 871 IRS — Third Party 26 USC 7609 |  |

## VI. CAUSE OF ACTION   (CITE THE U S CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

31 U.S.C. § 3729 et seq. (False Claims Act)

LENGTH OF TRIAL
via 15 days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A CLASS ACTION ☐ UNDER FR C P 23

DEMAND $

CHECK YES only if demanded in complaint
JURY DEMAND:   ☒ YES   ☐ NO

## VIII. RELATED CASE(S) IF ANY   (See instructions)

JUDGE _____   DOCKET NUMBER _____

DATE   12/20/02

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____

# APPENDIX D

JUDGE _____



FILED UNDER SEAL